D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
**ANDREW MARTIN,**

        **Plaintiff,**

        **v.**

**FREEPOINT COMMODITIES, LLC,**

        **Defendant.**
--------------------------------------------------------x

        **COMPLAINT**

        **DEMAND FOR JURY TRIAL**

Plaintiff Andrew Martin alleges as follows:

**JURISDICTION AND VENUE**

1.      Plaintiff Andrew Martin brings this action against Freepoint Commodities, LLC ("Freepoint"), alleging claims of retaliation under Connecticut, Texas, and Arizona law.

2.      This Court has original diversity jurisdiction under 28 U.S.C. § 1332 because (1) this case is brought by Plaintiff, a citizen and resident of Arizona; (2) Freepoint is incorporated in Delaware and headquartered in Connecticut; and (3) the amount in controversy exceeds $75,000, exclusive of interests and costs.

3.      Venue is proper in this District the because parties contracted to have disputes arising out of Plaintiff's employment with Freepoint brought in state or federal courts located in the State of New York, County of New York.

## THE PARTIES

4.      Defendant Freepoint Commodities, LLC is a Delaware limited liability company that is headquartered in Stamford, Connecticut and has offices throughout the country and world, including Houston, Texas. Freepoint is a global commodities merchant that trades in commodities such as oil and gas, as well as other energy products.

5.      Freepoint's primary investor is Stone Point Capital, a private equity firm.

6.      Plaintiff Andrew Martin is an experienced market analyst who was employed by Freepoint as a Senior Analyst from October 2014 until Freepoint terminated his employment on November 20, 2024.

## FACTS

7.      Plaintiff is an accomplished market analyst with over 20 years of experience in the oil trading sector. After completing his degree in chemical engineering, Plaintiff was employed by Shell Oil for approximately ten years, including as a market analyst for Shell Trading.

8.      In October 2014, Freepoint hired Plaintiff as a Senior Analyst in its oil products division. In his early tenure at Freepoint, Plaintiff worked for the company from its offices in Houston, Texas and Stamford, Connecticut but in recent years mainly worked from his home in Phoenix, Arizona. Plaintiff would travel as needed to domestic and international locations for work.

9.      As a Senior Analyst, Plaintiff's main responsibilities included generating trade ideas in oil markets. He created and maintained models for crude oil balances in the United States and globally. He also was responsible for creating models for Natural Gas Liquids

("NGLs") and mentored junior analysts. Trades he recommended resulted in hundreds of millions of dollars in profits from speculative trading at Freepoint over the decade.

10.     Until the Spring of 2022, Plaintiff reported to Rob Peck, Freepoint's then Global Head of Oil.

11.     In or about the Summer of 2021, Brazilian authorities began investigating senior employees of Freepoint, including Mr. Peck, in connection with their alleged role in a bribery scheme involving Brazil's state-run oil company, Petrobras.

12.     Around this same time, United States authorities, including the Department of Justice ("DOJ") and the Commodities Futures Trading Commission ("CFTC"), also began investigating Freepoint's dealings with Petrobras.

13.     According to a criminal information later filed by the DOJ in the United States District Court for the District of Connecticut, from 2012 to 2018, Freepoint, through its employees and agents, conspired to pay approximately $3.9 million to an oil and gas broker in Brazil knowing that such payments would be used to bribe Brazilian officials to obtain and retain business from Petrobras in connection with the purchase and sale of oil products. The DOJ alleged that Freepoint earned approximately $30.5 million in profits from the business it obtained from Petrobras through these methods. The DOJ's information alleged that, through these acts, Freepoint violated the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA").

14.     Ultimately, Freepoint entered into a three-year deferred prosecution agreement ("DPA") with the Fraud Section of the DOJ in December 2023 under which it admitted to the Petrobras bribery scheme and agreed to pay more than $98 million to resolve the criminal FCPA charges. The DPA required Freepoint to implement a corporate compliance program to ensure that its internal procedures contained: (a) an effective system of internal accounting controls

designed to ensure the Company maintained accurate books records and accounts; and (b) a "rigorous anti-corruption compliance program designed to effectively detect and deter violations of anti-corruption laws." The DPA required Freepoint to submit a written report to the DOJ in December 2024 detailing its remediation efforts and compliance programs. The Company further agreed that the DPA could be extended if the DOJ's Fraud Section determined that the Company failed to completely perform or fulfill any of its obligations under the DPA.

15.     At the same time it entered into the DPA, Freepoint also agreed to settle misappropriation-based fraud charges brought against it by the CFTC, which alleged that engaged in unlawful misconduct designed to obtain material non-public information from Petrobras in violation of the Commodities Exchange Act. The CFTC settlement required Freepoint to pay more than $91 million in civil monetary penalties and disgorgement.

16.     Aside from the Petrobras investigation, in the spring of 2022, Plaintiff learned from Shai Barnea that Peck had also mismarked physical components in his fuel oil books in order to hide tens of millions of dollars in losses that year.

17.     As a result of the Petrobras investigation, Freepoint replaced Peck as Global Head of Oil with Sarathi Roy in the Spring of 2022. Around this same time, Shai Barnea was made Freepoint's Head of Oil Products.

18.     The actions of Roy and Barnea both before and after they assumed their new positions in the spring of 2022 made clear that, despite the investigations and attention from federal regulators, they had no intention of running the oil group in a legal and compliant manner. Instead, they created an environment designed to maximize Freepoint's profits by: (1) manipulating the market through the solicitation of material non-public information from producers and refiners of oil and gas; and (2) using and/or distributing valuable proprietary

copyrighted market data without permission from or payment to the copyright holders. To do this, they pressured Plaintiff and other Freepoint analysts and traders to violate laws governing insider trading, copyright infringement, and misappropriation, and then retaliated against those who did not comply.

19.     Such conduct was demonstrated in Plaintiff's initial interview with Freepoint, At that time, Barnea pushed Plaintiff to misappropriate proprietary models about internal economics and supply and demand balances from Plaintiff's prior employer, Shell Trading. Plaintiff refused this demand, explaining that analysts had gotten into trouble for this exact type of misappropriation of non-public insider information.

20.     This did not stop Barnea from continuing to urge Plaintiff to violate the law after he was hired. As an example, in 2015, Barnea asked Plaintiff to leverage his personal contacts at Deer Park Refinery for non-public insider information about a possible labor strike. Barnea intended to trade on that non-public information, which could have an effect on gasoline prices in the Gulf Coast.

21.     In addition to pressuring Plaintiff to violate laws prohibiting insider trading and market manipulation, Roy and Barnea regularly stole or pressured other Freepoint employees to steal and illegally disseminate proprietary copyrighted information from subscription-based providers of market intelligence and research. Such companies offer intelligence on energy markets to traders and analysts, and subscriptions to reports containing such data may cost hundreds of thousands of dollars annually. The unauthorized dissemination of such copyrighted data to non-subscribers can result in the imposition of enormous civil and criminal sanctions.[1]

---

[1] *See, e.g.*, *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D.Md. 2003); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455 (D. Md. 2004).

22.    In the Spring of 2021, another Freepoint analyst, Analyst #1, informed Plaintiff that Barnea had instructed him to share proprietary maintenance and outage information from Industrial Info Resources ("IIR"), a provider of market intelligence whose subscriptions costs hundreds of thousands of dollars per year. Specifically, Analyst #1 was asked to share IIR's data – for which Freepoint had a subscription – with a third-party company, Energy Aspects, a similar market intelligence company and direct competitor of IIR.

23.    Plaintiff, who understood that sharing IIR's information without its permission would violate Freepoint's subscription agreement with IIR, told Analyst #1 that acquiescing to Barnea's demand would be illegal and advised Analyst #1 to report it to Freepoint's compliance and human resources departments. Analyst #1 later assured Plaintiff that he had reported Barnea as Plaintiff had advised. Shortly thereafter, Barnea attempted to terminate Analyst #1's employment. While this attempt was unsuccessful, Analyst #1 was transferred out of the oil group to another group within Freepoint. Although there was an extensive file detailing Barnea's bullying of Analyst #1, nothing concrete was done to remedy Barnea's behavior.

24.    In 2022, Plaintiff was informed by a different Freepoint analyst, Analyst #2 (who had replaced Analyst #1 in the oil group), that Barnea was pressuring him to share similar copyrighted data obtained from subscriptions to IIR with Energy Aspects. Upon learning this information, Plaintiff urged Analyst #2 to report Barnea's demand to compliance and human resources. Although Analyst #2 later assured Plaintiff he had done so, no concrete action was taken against Barnea.

25.    After this incident, Plaintiff participated in numerous conversations with Analyst #2 in which Analyst #2 described how he was being bullied and threatened by Roy and Barnea directly, as well as by their direct reports. Plaintiff advised Analyst #2 to report these incidents to

human resources, and upon information and belief, there is an extensive human resources file associated with this pattern of bullying. Despite this, Freepoint failed to take any tangible action against either Roy or Barnea.

26.    Similarly, since 2022 both Barnea and Roy had encouraged Freepoint analysts and traders to illegally obtain copyrighted information belonging to Wood Mackenzie (formerly Genscape) about industry inventories from their contacts in the industry without paying the copyright holder. The traders and analysts included Amnon Meiri, Dan Dorsky, and Matthew Albertelli.

27.     Roy, for his part, for years routinely disseminated proprietary data obtained from AlphaBBL, a data mining and analysis company, internally to analysts and traders in Freepoint's oil group. The copyrighted information Roy disseminated had not been paid for and was acquired without subscription to AlphaBBL.

28.    In Spring of 2024 Dan Dorsky (who was recruited by and reported to Barnea) requested that Plaintiff source and share copyrighted Wood Mackenzie gulf coast pipeline data by either getting it from a "friend or other analyst" or by getting a trial subscription to Wood Mackenzie. Plaintiff informed Dorsky that getting information from external contacts would be illegal and he certainly would not do that. In addition, Plaintiff told Dorsky that asking for a trial subscription would be unethical if there were no intention to purchase the subscription. Plaintiff asked Dorsky if he would be ready to pay for subscription cost, which would likely been between $50,000 and $100,000. Dorsky indicated that he probably would not be prepared to pay this cost. Plaintiff told Dorsky that he would obtain the exact subscription costs, but would not ask for trial unless there was plausible interest.

29.     In Spring of 2024, Barnea had a 360 performance review in which members of Freepoint's oil group were asked to provide feedback about him. The responses from colleagues and direct reports were extremely critical.  After Barnea had read the review, Roy (who shared an office with Barnea) reported to Plaintiff that Barnea had said, "I didn't realize people thought I was a monster." Despite the overwhelmingly negative feedback, Freepoint again took no action against Barnea.

30.     On June 12, 2024, Plaintiff witnessed firsthand how Roy became violent and vindictive when opposed. On that date, Plaintiff was having a casual conversation with Roy in Roy's office in Stamford, Connecticut while they were both visiting that office. In the middle of their conversation, Roy received a phone call. Although Plaintiff got up to leave when Roy picked up the phone, Roy told Plaintiff to stay.  Roy subsequently began shouting profanities at and making threatening statements to the unknown caller, including that he would "kill" an unknown person if they "ever came around again." When Roy completed the conversation, he told Plaintiff that the call was associated with a human resources incident at Freepoint that happened the week before.

31.     In the Summer of 2024, Plaintiff became aware that Barnea, with Roy's backing, was attempting to push Analyst #2 out of the company after he repeatedly refused to comply with Barnea's illegal requests like those detailed above. Plaintiff learned this information from Sarah Torpey, Freepoint's global head of human resources, who told Plaintiff during a call that it was obvious Barnea and Roy were pushing Analyst #2 out. Ultimately, Analyst #2 did not leave Freepoint, but only because Freepoint's CEO, David Messer, stepped in to stop him from accepting an external offer by reassigning him to another position within Freepoint away from Barnea and Roy.

32.     In the summer of 2024 Mayo Jayarajah (who reports to Barnea) reached out to Plaintiff for assistance with a gasoline blending model (formatted as an excel file). Mayo was confused about blending associated with the T10 properties.  Plaintiff looked at the spreadsheet model and, given his prior experience, realized that the data was not from Freepoint, which Mayo confirmed.  Plaintiff assumed it likely came from either Mayo's former employer, Pilot, or from Castelton Commodities International, the prior employer of Amnon Meiri (another Freepoint gasoline trader) who had been working with Mayo on the specific blend cargo. Plaintiff explained to Mayo that he should not be using this data, as it was a trade secret. Plaintiff also explained that the model had been tuned with the "other company's" component data, so it would not be as accurate for the blend Freepoint was attempting to make. Plaintiff shared an industry standard way to model T10, which is a non-linear property (converting to Evap @temp). Freepoint subsequently went on to win an Ecuadorian gasoline tender as a result.

33.     This interaction was indicative of the brazenly illegal culture Barnea and Roy had perpetuated with in the oil group, especially as Barnea was key to recruiting both Mayo and Amnon. Moreover, as Plaintiff continued to oppose such conduct, including by counselling both Analyst #1 and Analyst #2 to report the illicit behavior, Barnea and Roy began to take steps to push him out just as they had done to these other employees.

34.     This began by attempting to cut Plaintiff off from the larger oil group. In mid-July 2024, Plaintiff returned from vacation to find that Roy and Barnea had excluded him from a regular videoconference that allowed traders from different Freepoint offices to chat and communicate with one another in real time. When Plaintiff – who had regularly joined this videoconference in the past – learned how to access it and joined, Roy initially told Plaintiff he could remain. Shortly thereafter, however, Barnea contacted Plaintiff and informed him that

Roy's decision had changed and that Plaintiff was not allowed in the conference. After Barnea ordered Plaintiff to immediately log off, he was forced into the humiliating position of informing his peers that he could no longer participate in their videoconference.

35.     In late July 2024, Plaintiff had a meeting with Sarah Torpey – Freepoint's Director of Human Resources – to discuss how Plaintiff could work better with Barnea, given Barnea's 360 feedback. Torpey told Plaintiff that he was doing great, and that there was not much Plaintiff could change. She informed Plaintiff that management was aware of many of the issues with Barnea, but given Plaintiff's unique perspective, track record, and long tenure at Freepoint, she suggested that he reach out to David Messer, Freepoint's CEO, directly with any concerns.

36.     With this nudge from Torpey, and increasingly concerned with these illegal and non-compliant practices, Plaintiff emailed Messer, about his concerns on July 28, 2024. Although Plaintiff was extremely concerned that he would be subject to the same bullying as had been received by the other analysts who crossed Barnea and Roy, he believed that Messer would be forced to act given the existence of Freepoint's deferred prosecution agreement, which had resulted from uncorrected compliance issues.

37.     In his email to Messer, Plaintiff explained that "festering issues" created by Barnea and, by extension, Roy, had been affecting the oil team for the past two years. This included asking analysts "to undertake tasks that are ethically questionable" and created reputational risk for both Freepoint and Messer.

38.     Although Messer responded to Plaintiff on July 29, they were unable to schedule a meeting about Plaintiff's email until August 2, 2024. In the interim, Messer travelled to Freepoint's Houston office with Mike Beck, who was Freepoint's president and effectively

second in command of the company after Messer. Frontline traders in Freepoint's Houston office informed Plaintiff that during this visit, Messer and Beck held individual meetings where they heard similar complaints about the toxic culture created by Barnea and Roy.

39.     On August 2, 2024, Messer and Plaintiff held a call about Plaintiff's July 28 email. At the time of the call, Plaintiff was in Arizona and Messer was at his home in Connecticut.

40.     At the beginning of the call, Plaintiff was concerned about Messer's reaction to his complaints, as Messer had close personal relationships with both Roy and Barnea. Specifically, Roy had a decades-long personal and professional relationship with Messer that began in the 1990s at Sempra, a similar commodities company. Barnea, who also worked at Sempra with Messer and Roy in the 2000s, was one of the very few Freepoint employees Messer had invited to his recent wedding. Messer acknowledged these relationships at the beginning of the conversation with Plaintiff, stating that he wanted to address the "elephant in the room" by assuring Plaintiff that he would show no favoritism to either Barnea or Roy, and urged Plaintiff to be open about all of his concerns.

41.     Assured that Messer would take his complaints seriously, Plaintiff expressed his concerns that core of Roy and Barnea's operation was founded on blatant disregard of insider trading and copyright laws, coupled with a culture of intimidation and retaliation against those who refused to play along. Specifically, Plaintiff informed Messer about all of the incidents and practices outlined above in Paragraphs 19-32, including: (1) his refusal to accede to Barnea's demands to misappropriate Shell's proprietary models, to illegally acquire commercial data, and to solicit non-public insider information; and (2) Barnea and Roy's culture of both illegally accepting and distributing distribution of, and pressuring other analysts to distribute, copyrighted

information without payment or permission. Plaintiff also informed Messer that he was being excluded from the oil group's videoconference, and of his belief that being so excluded and siloed would likely only amplify Barnea's acts of coercion (both directly and through reports) to have others illegally acquire copyrighted information and trade secrets.

42.    At the conclusion of the conversation, Messer assured Plaintiff that his concerns would be taken seriously and asked for time to address the issues Plaintiff had raised. Messer mentioned that he would share Plaintiff's concerns with Beck, Freepoint's president.

43.    Although Plaintiff thought that the conversation with Messer had ended on a positive note, he soon was given reason to be concerned about his decision to come forward.

44.    In early September, Plaintiff became aware that a junior analyst was re-permissioning internal databases so that Plaintiff – who had previously had full access – could no longer use them. The junior analyst also told Plaintiff that she was no longer allowed to speak about her work with Plaintiff without permission from a trader (Amnon Meiri). When Plaintiff spoke to Meiri about this, he stated that this was "management's" decision and not his. Plaintiff escalated by questioning Roy and Barnea about this issue in a Slack conversation. They told Plaintiff that the junior analyst could not share information from him because she was being "paid for" by a single trader and Plaintiff was being "paid for" by Jeremy Weil, a senior trader who reported directly to Messer. This was news to Plaintiff, who had always reported to Roy since Roy had become head of the oil group and whose expenses Roy had always approved. Concerned, Plaintiff reached out to Sarah Torpey in human resources on September 10, 2024 for clarification about whether his reporting structure had changed. She responded that she was not aware of any reporting changes but would escalate this question.

45.     On September 11, 2024, Messer and Beck held an "all hands" meeting with the oil team. Messer started the meeting by emphasizing that Freepoint's "culture," was of the utmost importance and was being "undermined." He then handed the meeting off to Beck, who proceeded to rant that members of the team were like children who were "worse than kids at school." Beck ordered the team to stop "rooting against" one another and warned that if the "infighting" did not stop immediately, "people would be fired."

46.     This meeting was clearly held in response to Plaintiff's complaints. While Plaintiff initially believed that the purpose of the meeting was to bring Roy and Barnea in line, he soon discovered that Freepoint had no intention of rectifying their behavior. Instead, Freepoint did precisely what Beck had intimated at the September 11 meeting – firing those employees, like Plaintiff, who rocked the boat.

47.     On October 22, 2024, Weil was terminated. No reason was provided for this termination. Weil's dismissal was unprecedented as he was directly responsible for trading book with hundreds of millions of profit over his decade-plus long career at Freepoint. Weil had often expressed his concerns to Plaintiff about the unethical manner in which Roy and Barnea operated, and how he did not trust them. He had also told Plaintiff on several occasions that he viewed Plaintiff as an integral part of the company, and that if Plaintiff were not part of Roy's larger oil group, he would be happy to take on the costs of Plaintiff's employment by directly reporting to Weil as part of his independent group. Indeed, Weil had directly employed both Analyst #1 and Analyst #2 after Roy and Barnea had attempted to push them out of the company.

48.     On October 31, 2024, Plaintiff became aware that Freepoint trader Dan Dorsky was leading a weekly crude oil meeting that was directly relevant to Plaintiff's work. When Plaintiff asked Dorsky about the meeting, Dorsky told Plaintiff he had been told by Barnea only

to include a small subset of the oil group in the meeting and that Plaintiff was not part of that subset. Dorsky opined, however, that Plaintiff was more suitable for leading the meeting and asked him to take it over.

49.    When Plaintiff had a call with Barnea on November 5, 2024, to discuss leading this meeting, Barnea made clear to Plaintiff that Dorsky was informing him about Plaintiff's comments about Barnea made in one-on-one conversations with Dorsky, stating that things Plaintiff had said to Dorsky "upset" Barnea.

50.    On November 1, 2024, Roy informed Plaintiff that Roy and Beck would be assuming responsibility for all personnel decisions on the oil team. This concerned Plaintiff given that (1) Plaintiff had complained to Messer about illegal Roy's conduct and (2) Messer had informed Plaintiff he would share the content of Plaintiff's complaints with Beck.

51.    On November 7, 2024, Dorsky led weekly crude oil meeting for the last time and announced that Plaintiff would take over. Plaintiff took on his expanded responsibilities on November 14 by leading the meeting and making a detailed presentation that Barnea had requested.

52.    In mid-November 2024, Freepoint's compliance department sent a company-wide email explaining that the FBI was planning on performing a site visit to Freepoint's headquarters in Stamford, Connecticut in early December 2024 to verify Freepoint's compliance with the terms of the DPA. The email notified Freepoint employees that they could make confidential comments in advance of this visit.

53.    In response to this email, Plaintiff submitted what he thought was an anonymous note to Freepoint's compliance department in which he explained that there was a lack of trust in

middle management, specifically Roy and Barnea, and that their vindictive nature likely prevented employees coming forward with compliance concerns.

54.    Around this same time, Plaintiff told Roy that he would be in Freepoint's Stamford headquarters for approximately one week in early December 2024 so he could attend the company's holiday party.

55.    On November 20, 2024, just weeks before the FBI's scheduled site visit and Plaintiff's scheduled trip to the Stamford office, Freepoint terminated Plaintiff's employment. Roy informed Plaintiff of his termination without providing any reason, simply stating that it would be Plaintiff's last day at Freepoint. Freepoint traders such as Patrick Guillot, Wendy Spears and Connor Nix – who would normally be informed of the pending termination of an analyst of Plaintiff's tenure with whom they worked closely – were never consulted or informed about Plaintiff's termination.

56.    Other details of Plaintiff's termination failed to follow Freepoint's usual practices for the termination of analysts of his tenure. Specifically, neither Plaintiff nor other Freepoint traders with whom he spoke could remember a time when a Freepoint analyst had been fired without cause, much less an analyst of Plaintiff's seniority and tenure.

57.    After being terminated, Plaintiff received an email from Freepoint's human resources department informing him that if he sought unemployment, he could list the reason for his termination as "performance" or "lack of work."

58.    Neither of these reasons had any validity. First, Plaintiff's performance was consistently stellar, as demonstrated by the uniformly positive feedback he received from both his supervisors and his peers. Indeed, at the end of October 2024, Plaintiff received a handwritten note from Messer congratulating him on his 10-year anniversary with Freepoint, praising him for

his "great market calls over the years," and stating that he looked forward to the "next decade" with Plaintiff.

59.    Earlier that year, in February of 2024, Plaintiff was awarded a raise of 12.5% and a 100% bonus. In addition, the day before he was fired, a market call Plaintiff had made that certain derivative prices of WTI crude oil would fall had come to fruition. Thus, any Freepoint traders who had made trades based on Plaintiff's prediction made substantial profits based on this call.

60.    There as also not a "lack of work" at the time of Plaintiff's termination. In fact, when he was terminated, Plaintiff was getting ready to analyze weekly statistics and, after his termination, there was no one who could run his normal processes or produce the reports he regularly distributed to Freepoint traders. Moreover, Plaintiff's surprise termination left many of his in-progress reports and models incomplete with no handover to any other Freepoint employee.

61.    The true reason for Plaintiff's termination was not his "performance" or any purported "lack of work." Instead, Freepoint terminated Plaintiff because it knew that, having repeatedly refused to participate and instead raising complaints about Roy and Barnea's illegal conduct, he would not hesitate to report any illegality to the FBI during its site visit. Given the existence of the DPA and the extraordinarily damaging consequences for the Company that would flow from any breach of that agreement, this was a risk Freepoint could not take. Accordingly, Freepoint terminated Plaintiff to ensure his silence.

### FIRST CLAIM FOR RELIEF
**Retaliation in Violation of the Arizona Employee Protection Act ("AEPA")**

62.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

63.     The Arizona Employee Protection Act ("AEPA"), A.R.S. § 23-1501 provides a cause of action for employees who have been terminated in retaliation for: (1) refusing to commit acts that would violate any Arizona statute; or (2) disclosing information or a reasonable belief that the employer has violated, is violating, or will violate any statute of the state of Arizona.

64.     Here, the acts of Roy and Barnea that Plaintiff disclosed reasonably constitute violations of (1) Arizona's Consumer Fraud Act, which prohibits "any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise," A.R.S. § 44-1522; and/or (2) Arizona's theft statute, which prohibits (a) the unauthorized use of services or property of another that have been provided for limited, authorized uses and (b) obtaining services known to be available for compensation without payment or diverting another's services for one's own benefit without authorization, *see* A.R.S. § 13-1802.

65.     In violation of the AEPA, Defendant retaliated against Plaintiff for raising his concerns by terminating his employment.

66.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary and benefits.

67.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

68.     Plaintiff seeks all legal and equitable remedies available for violations of the AEPA, including unpaid compensation, compensatory damages for emotional distress, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Conn. Gen. Stat. § 31-51q

69.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

70.     In violation of Conn. Gen. Stat. § 31-51q, Defendants terminated Plaintiff's employment in retaliation for his raising an issue of public concern – namely Freepoint's illegal practices as exemplified through the conduct of Roy and Barnea.

71.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary and benefits.

72.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

73.     Plaintiff seeks all legal and equitable remedies available for violations of Conn. Gen. Stat. § 31-51q, including unpaid compensation, compensatory damages for emotional distress, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### Wrongful Termination in Violation of Texas Common Law.

74.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

75.     In violation of Texas common law, Defendant wrongfully terminated Plaintiff's employment because of his refusal to commit unlawful acts – namely misappropriate proprietary models from his former employer and obtain material, non-public information about other companies from his industry contacts for purposes of benefiting Freepoint. *See Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733 (TX 1985).

76.     As a result of Defendant's conduct as alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional distress, and mental anguish.

77.     Plaintiff seeks all legal and equitable remedies available for violations of Texas law, including unpaid compensation, damages for emotional distress and/or pain and suffering, punitive damages, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, and punitive damages, to be paid by Defendant;

B.     Penalties available under applicable laws;

C.     Costs of action incurred herein, including expert fees;

D.     Attorneys' fees;

E.    Pre-judgment and post-judgment interest, as provided by law; and

F.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  New York, New York
        May 14, 2025

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By: ___*Lucas C. Buzzard*_____
    D. Maimon Kirschenbaum
    Lucas C. Buzzard
    32 Broadway, Suite 601
    New York, NY 10279
    Tel: (212) 688-5640
    Fax: (212) 688-2548

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.